UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

| | |
|---|---|
| YOKO ONO LENNON, SEAN ONO LENNON, JULIAN LENNON, and EMI BLACKWOOD MUSIC, INC., | 08 CV 3813 (SHS)(FM) |
| Plaintiffs, | **Declaration of Nancy Weshkoff In Support of Plaintiffs' Motion For A Preliminary Injunction** |
| -against- | |
| PREMISE MEDIA CORPORATION, L.P., C&S PRODUCTION L.P. d/b/a RAMPANT FILMS, PREMISE MEDIA DISTRIBUTION L.P. AND ROCKY MONTAIN PICTURES, INC., | |
| Defendants. | |

------------------------------------------------------------------x

**NANCY WESHKOFF** declares:

1. I am Senior Vice President of the Synchronization Department at EMI Music Publishing ("EMI"). I submit this affidavit in support of Plaintiff's Motion for a Preliminary Injunction. The facts stated herein are based upon my personal knowledge and review of company records.

<u>EMI's Role as Exclusive Administrator</u>

2. EMI Music Publishing is one of the largest and most well-known music publishers in the world. The collection of musical compositions owned or controlled by EMI Music Publishing (*i.e.*, the "catalog") is vast. EMI's catalog spans all types of music and includes an enormous number of critically and commercially successful musical compositions, including certain songs which are time honored and enjoyed by music fans spanning several generations.

1

3. The business of music publishing involves acquiring rights, including the copyright, in and to musical compositions through agreements with songwriters, and exploiting those rights through various licensing arrangements with third parties. These licensing arrangements generate publishing income, which is apportioned between the music publisher and the songwriters in accordance with the parties' respective agreements.

4. Such licensing arrangements include "synchronization licenses", which, for example, permit the use of musical compositions in motion pictures, television programs and commercials, and other audio-visual uses.

5. EMI licenses its musical compositions for a broad range of audio-visual uses. Each such use differs, in terms of, amongst other things, the duration of the song for a particular use, and the type of audio-visual use. The fees charged for such synchronization licenses similarly vary, ranging from hundreds of dollars to many hundreds of thousands of dollars for a given use. The fees are based upon the nature of the use, and the importance and popularity of the musical composition sought by a licensee. A successful and well-known song can command synchronization licensing fees in the many hundreds of thousands of dollars, even for a short use of the respective musical composition.

6. Another very important aspect of exploiting musical compositions through synchronization licenses is whether the particular songwriter wants his or her musical composition associated with a particular cause, product, or image. Because there is such high sensitivity in using a songwriter's musical composition for a particular use, songwriters often negotiate for consent in their songwriter agreements with EMI.

7.  Often, a songwriter will require the publisher to seek his or her consent before the respective musical composition is licensed for a particular synchronization use. This is especially important to both the songwriter and the music publisher because even a single association of a song to an unpopular or infamous cause, thought or idea can permanently devalue the song, and lessen the opportunities for such song. In addition, such an unfavorable and/or unwanted association causes harm both to the songwriter and to the music publisher, casting them in a negative light, or worse, in association with the unfavorable or unwanted association. As such, music publishers are very selective about pairing songs with uses, and about ensuring that they seek the appropriate consent from a songwriter for the use of their song in a synchronization opportunity.

The Musical Composition "Imagine"

8.  British songwriter and performer John Lennon was a member of the rock band the Beatles during the 1960s. The Beatles are arguably one of the most well-known and influential musical groups in the history of rock music. In his solo career, John Lennon rose to fame as a highly celebrated and influential songwriter, solo artist, and political activist, until his tragic assassination in 1980 in New York City.

9.  During his solo years, John Lennon composed the musical composition "Imagine", ("Imagine" or "the Song") which to this day, remains one of the most critically acclaimed and greatest songs ever written. In 2004, Rolling Stone magazine voted "Imagine" the third greatest song of all time. Likewise, the public performance rights organization BMI named "Imagine" as one of the top 100 most performed songs in the 20th Century. A simple internet search will reveal the worldwide recognition, accolades, and importance of the song "Imagine."

Unauthorized Use of "Imagine" by Defendants

10. On April 16, 2008, EMI learned for the first time from press reports that the Defendants' film titled "Expelled: No Intelligence Allowed" (or, the "Movie") contained an unauthorized excerpt of the musical composition "Imagine". I sent a member of my staff to view "Expelled: No Intelligence Allowed" on April 18, 2008 at its first showing at 11:40 a.m. at the E-Walk Stadium 13 Theaters, located at 247 West 42nd Street, in Manhattan, New York.

11. This viewing of Defendants' film confirmed that Defendants' use of "Imagine" was unauthorized.

12. EMI Blackwood Music, Inc. -- one of the many music publishing companies operating collectively under the trade name EMI Music Publishing -- is the exclusive administrator of the musical composition "Imagine". As such, any use of "Imagine" in an audio-visual work would require a synchronization license from EMI.

13. The use of the musical composition "Imagine" is violative of EMI's exclusive rights to exploit the Song in different media. In addition, such use is also causing harm to EMI's reputation. Initial press reports of the film indicated that there was widespread criticism and concern over the use of the song "Imagine" in the film. Internet bloggers immediately speculated on why Yoko Ono, the widow of John Lennon, had allowed the Song to be featured in such a religiously, politically and scientifically sensitive film.

Defendants Failure To Secure a License for "Imagine"

14. I have been employed at EMI for fifteen (15) years. During that time, I have been in EMI's Copyright and Synchronization Departments in various capacities.

In my current position as Senior Vice President, I am responsible for overseeing synchronization requests that EMI receives from potential licensees interested in licensing songs from EMI's vast catalog of musical compositions. I oversee the staff member who was responsible for licensing certain songs to Defendants for use in their Movie.

15. EMI was never approached by any of the Defendants for proper licensing of this important song, which is one of EMI's most prized and protected musical compositions in its vast catalog of songs. Notably, Defendants <u>did</u> approach EMI to secure a synchronization license for another musical composition owned and controlled by EMI for use in the Movie.

16. Whenever a potential licensee requests permission for the use of an EMI-controlled musical composition in a film, that request is handled by EMI's Synchronization Department. As Senior Vice President in EMI's Synchronization Department, I am responsible for overseeing such requests.

17. A potential licensee is required to send EMI their request in writing, which request includes the title of the song being requested, the title and brief description of the film, the type and duration of the use of the song, and a requested fee quote for such use.

18. Once EMI receives the written request, we then confirm whether the songwriter's consent is required for the use of their song(s) in the film. We thereafter contact the songwriter or the songwriter's designated representative in writing and provide them with the detailed preliminary information regarding the requested use. If we receive confirmation from the songwriter or songwriter's designated representative that the proposed use and fee are satisfactory, we then contact the potential licensee and

confirm that the use and terms are acceptable. If the songwriter or songwriter's designated representative rejects the use, we then contact the potential licensee and explain that the requested use has been denied.

19. In this case, had EMI received a synchronization request for the use of "Imagine" in the Movie, EMI would have been contractually obligated to contact Mrs. Lennon, as successor in interest to the Estate of John Lennon, for consent for such use.

20. Because the film touches upon sensitive topics, and because "Imagine" was being used in a disturbing part of the film, I am confident that even if we submitted a request to Mrs. Lennon for the use of "Imagine" in the film, that request would have been denied.

Irreparable Harm to Plaintiffs

21. The reputation of EMI, its core business, and our songwriters are endangered when third-parties make unauthorized uses of our musical compositions. Protecting the rights of our intellectual property and our songwriters is of paramount importance, especially in this day and age when piracy is a major concern in our business.

22. As such, the damage that is done to EMI from disrespecting and infringing upon EMI's primary assets -- its musical compositions -- does not end merely with lost license fees. Rather, that harm extends to the perception that third parties need not properly license our intellectual property.

23. "Imagine" is one of EMI's most important musical compositions, a true gem in our catalog of songs. The Song is clearly associated with John Lennon, one of the most important musical and cultural figures in modern music, and someone who is still

revered and remembered despite his tragic assassination in 1980. EMI has worked closely with Mrs. Lennon and her representatives for years, and has been extremely cautious and very selective in how each of Lennon's musical compositions, especially "Imagine", are licensed to third-parties.

24. There is no hardship to the Defendants to remove the musical composition "Imagine" from their film. The Song is incidental to the message and meaning of their film, and is certainly not required to perpetuate that message.

25. Based on the manner in which the credits are displayed it also makes it appear to the average person that the Song was licensed.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s/ Nancy Weshkoff
Nancy Weshkoff

Original Affidavit of Nancy Weshkoff to be submitted to the Court.