UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
                                       :

YOKO ONO LENNON, SEAN ONO
LENNON, JULIAN LENNON, and EMI         :
BLACKWOOD MUSIC, INC.,                                     08 CV 3813 (SHS)
                                       :

                Plaintiffs,
                                       :

     -against-
                                       :

PREMISE MEDIA CORPORATION, L.P.,    :
C&S PRODUCTION L.P. d/b/a RAMPANT
FILMS, PREMISE MEDIA DISTRIBUTION   :
L.P. and ROCKY MOUNTAIN PICTURES,
INC.,                                          :
                Defendants.
------------------------------------------------------ x

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Anthony Falzone (Admitted *Pro Hac Vice*)
Julie Ahrens (JA-0372)
Center for Internet and Society
STANFORD LAW SCHOOL
559 Nathan Abbott Way
Stanford, CA  94305-8610
(650) 736-9050 Telephone

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ......................................................................................................... 2

ARGUMENT ............................................................................................................... 3

I.    Plaintiffs Must Meet An Exceedingly High Burden To Obtain A Mandatory Injunction That Silences Expressive Speech On An Important Issue Of Public Concern ................................................................. 3

II.    Plaintiffs Have Not Established Likelihood Of Success On The Merits Of Their Copyright Infringement Claims ..................................... 5

    A.    There Is A Significant Question Regarding Ownership Of The Copyrights Plaintiffs Assert ................................................................ 5

    B.    Defendants' Use Of Imagine Is Protected By Fair Use ............................. 5

        1.    Purpose And Character Of The Use ................................................. 6

            a.    Transformative Purpose ...................................................... 6

            b.    Commercial Use................................................................... 13

        2.    Nature Of The Copyrighted Work ................................................ 14

        3.    Amount And Substantiality Of The Portion Used ......................... 14

        4.    Market Effect .................................................................................. 16

            a.    Substantial Public Interest.................................................. 16

            b.    No Cognizable Harm ......................................................... 17

III.    Plaintiffs Cannot Show Irreparable Harm And The Balance Of Hardships Tips Strongly In Favor Of Defendants ................................. 19

    A.    Plaintiffs Fail To Show Irreparable Harm ............................................ 19

    B.    The Balance of Hardships Weigh Heavily in Defendants' Favor ............. 22

CONCLUSION.......................................................................................................... 24

CERTIFICATE OF SERVICE ................................................................................ 25

## TABLE OF AUTHORITIES

### CASES

*American Geophysical Union v. Texaco, Inc.*,
  60 F.3d 913 (2d Cir. 1994)................................................................16

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006)........................................................ passim

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006).........................................6, 7, 9, 10,
                                                                    13, 14, 15, 16

*Byrne v. British Broadcasting Corp.*,
  132 F. Supp. 2d 229 (S.D.N.Y. 2001).........................................12

*CBS Inc. v. Davis*,
  510 U.S. 1315 (1994)................................................................22

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)........................................................ passim

*Canon Inc. v. GCC International, Ltd.*,
  450 F. Supp. 2d 243 (S.D.N.Y. 2006), *aff'd*, 2008 WL 213883 (2d Cir. Jan.
  25, 2008) ................................................................20

*Castle Rock Entertainment, Inc. v. Carol Publ'g Group, Inc.*,
  150 F.3d 132 (2d Cir. 1998)........................................6, 13, 15, 16,
                                                                    17, 18

*Caterpillar Inc. v. Walt Disney Co.*,
  287 F. Supp. 2d 913 (C.D. Ill. 2003) .........................................23

*Cf. Stanley v. Georgia*,
  394 U.S. 557 (1969)................................................................13

*Cheever v. Academy Chicago, Ltd.*,
  690 F. Supp. 281 (S.D.N.Y. 1988) .........................................21

*Cherry River Music Co. v. Simitar Entertainment, Inc.*,
  38 F. Supp. 2d 310 (S.D.N.Y. 1999)........................................21

*Christopher Phelps & Associate, LLC v. Galloway*,
  492 F.3d 532 (4th Cir. 2007) ................................................20

ii

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.,*
    886 F.2d 490 (2d Cir. 1989)............................................................................19

*Clonus Associate v. Dreamworks, LLC,*
    417 F. Supp. 2d 248 (S.D.N.Y. 2005).............................................................20

*Cohen v. California,*
    403 U.S. 15 (1971)..........................................................................................17

*Dynamic Solutions, Inc. v. Planning & Control, Inc.,*
    646 F. Supp. 1329 (S.D.N.Y. 1986)...............................................................21

*EMI Catalogue Partnership v. Hill, Holliday, Connors, Cosmopulos Inc.,*
    228 F.3d 56 (2d Cir. 2000)..............................................................................19

*Eden Toys, Inc. v. Florelee Undergarment Co, Inc.,*
    697 F.2d 27 (2d Cir. 1982)................................................................................5

*Eldred v. Ashcroft,*
    537 U.S. 186 (2003)...........................................................................................4

*Hofheinz v. A & E Television Networks, Inc.,*
    146 F. Supp. 2d 442 (S.D.N.Y. 2001).......................................................7, 13

*Hofheinz v. AMC Products, Inc.,*
    147 F. Supp. 2d 127 (E.D.N.Y. 2001) ............................................................23

*Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2007)........................................................................................20

*Leibovitz v. Paramount Picture Corp.,*
    137 F.3d 109 (2d Cir. 1998)...........................................................................16

*LucasFilm Ltd. v. Media Market Group, Ltd.,*
    182 F. Supp. 2d 897 (N.D. Cal. 2002) ...........................................................22

*Mason v. Jews for Jesus,*
    No. 06 Civ. 6433 (RMB), 2006 WL. 3230279 (S.D.N.Y. Nov. 8, 2006)....................22

*Metropolitan-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,*
    518 F. Supp. 2d 1197 (C.D. Cal. 2007) ..........................................................20

*MyWebGrocer, L.L.C. v. Hometown Information, Inc.,*
    375 F.3d 190 (2d Cir. 2004).............................................................................3

*NXIVM Corp. v. Ross Institute,*
364 F.3d 471 (2d Cir. 2004)...................................................................7, 11

*New York Times Co. v. Sullivan,*
376 U.S. 254 (1964)...........................................................................4, 17

*New York Times v. Tasini,*
533 U.S. 483 (2001)...............................................................................21

*Oliveira v. Frito-Lay, Inc.,*
251 F.3d 56 (2d Cir. 2001).....................................................................19

*Red Lion Broad. v. F.C.C.,*
395 U.S. 367 (1969)...............................................................................17

*Ringgold v. Black Entertainment Television, Inc.,*
126 F.3d 70 (2d Cir. 1997).....................................................................15

*Rogers v. Grimaldi,*
875 F.2d 994 (2d Cir. 1989)...................................................................19

*Suntrust Bank v. Houghton Mifflin Co.,*
268 F.3d 1257 (11th Cir. 2001) ..........................................................4, 21

*Tom Doherty Associate, Inc. v. Saban Ent., Inc.,*
60 F.3d 27 (2d Cir. 1995)....................................................................3, 20

*Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.,*
277 F.3d 253 (2d Cir. 2002)......................................................................3

*Va. State Board of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
425 U.S. 748 (1976)...............................................................................16

*Vance v. Universal Amusement Co.,*
445 U.S. 308 (1980).................................................................................4

*Wade Williams Dist., Inc. v. Am. Broad Co., Inc.,*
No. 00 Civ. 5002 (LMM) 2005 WL. 774275 (S.D.N.Y. Apr. 5, 2005)........................12

*Woods v. Universal City Studios,*
920 F. Supp. 62 (S.D.N.Y. 1996) .............................................................21

*Wright v. Warner Books, Inc.,*
953 F.2d 731 (2d Cir. 1991)...................................................................16

## FEDERAL STATUTES

17 U.S.C. § 106 ..................................................................................................6

17 U.S.C. § 107 ...........................................................................6, 7, 13, 14, 16

17 U.S.C. §§ 304(a)(1)-(2) .................................................................................5

17 U.S.C. 501(b) ................................................................................................5

U.S. Const. art. I, § 8, cl. 8 ................................................................................6

## MISCELLANEOUS

*Mark A. Lemley & Eugene Volokh, Freedom of Speech and Injunctions in
Copyright Cases*, 48 Duke L.J. 147 (1998) ....................................................4

*Pierre N. Leval,  Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1107,
1110 (1990).......................................................................................................5

## PRELIMINARY STATEMENT

Defendants Premise Media Corporation, C&S Production LP, Premise Media Distribution LP, and Rocky Mountain Pictures, Inc. (collectively, "Defendants") are the producers and distributors of *Expelled: No Intelligence Allowed* ("*Expelled*" or the "Film"). *Expelled* is a controversial film about a highly contentious issue – whether proponents of the theory of intelligent design are being unfairly silenced in academia and beyond. The Film was released on April 18, 2008 on more than 1,000 screens nationwide.

Plaintiffs Yoko Ono Lennon, Sean Ono Lennon, and Julian Lennon (collectively, "Plaintiffs") ask this Court to issue an injunction that would result in the withdrawal of the Film in hundreds of theaters across the country for "destruction" or "editing." The basis for this extraordinary request is the fact *Expelled* uses fifteen seconds of music from the song *Imagine*, written and performed by the late John Lennon. Plaintiffs demand the deletion of this fifteen-second clip on the ground it infringes their copyrights.

Plaintiffs fall well short of meeting the burden necessary to obtain the extraordinary injunction they seek. Plaintiffs have not established ownership of the copyrights they assert because the registration certificates they submit raise significant ownership questions that Plaintiffs do not address. Even if Plaintiffs had established ownership, the use of a small portion of a copyrighted work for the purpose of criticism and commentary has long been protected by the fair use doctrine. *Expelled* criticizes the overtly anti-religious message that *Imagine* embodies, both explicitly and by implication, and uses precisely the ten words of the song the Film needs to make its point. Plaintiffs also fail to show irreparable harm. Lost licensing revenue is obviously compensable by money damages, and their asserted right to control the use of *Imagine* is nothing more than the right to control criticism of the song and the ideas it represents. Defendants' free speech rights are at stake here. The injunction Plaintiffs demand would literally

1

censor debate over an important public issue, to say nothing of the significant economic harm that would result were Defendants forced to re-cut the film in theaters, or on DVD.

Plaintiffs simply do not meet the very high burden they must discharge in order to obtain a mandatory injunction that would silence expressive speech on an issue of national public importance. Plaintiffs' preliminary injunction motion should be denied.

## BACKGROUND

Plaintiffs assert they own the copyrights in the composition of *Imagine*, which was written by John Lennon in 1971 and has since gone on to receive critical and popular acclaim. *See* Complaint at ¶¶ 1-3. The original registration for the copyrights at issue here identifies Northern Songs Limited, a United Kingdom corporation, as the sole owner of those copyrights. *See* Complaint Ex. B. In 1998, Plaintiffs registered renewal rights in the composition. *See id.* Ex. A.

Defendants are the producers and distributors of *Expelled*, a one hour and thirty-nine minute documentary that explores a highly contentious issue – the theory of intelligent design, and whether proponents of this theory are being unfairly silenced in academia and beyond. *See* Declaration of John Sullivan in Opposition to Motion for Preliminary Injunction ("Sullivan Dec.") ¶ 7. The film premiered on April 18, 2008 on more than 1,000 theater screens nationwide. *See id.* ¶ 22. It has remained controversial and important ever since. A number of states are considering legislation that would permit the teaching of intelligent design in classrooms alongside the theory of evolution. *See* Declaration of A. Logan Craft in Opposition to Motion for Preliminary Injunction ("Craft Dec.) ¶¶ 16-19. The Film plays a central role in the public debate on this issue.

As set forth in greater detail below, the Film uses a short excerpt of *Imagine* as part of its discussion of the intelligent design issue, and the proper role of religion in society. *See* Sullivan

Dec. ¶¶ 13-21. Specifically, the Film criticizes, explicitly and implicitly, the anti-religious message that portions of the song and its lyrics appear to convey:

> Nothing to kill or die for
> And no religion too

Sullivan Dec. ¶¶ 13 and 17. The excerpt used in the Film contains only these ten words and lasts fifteen seconds. *See Id.* ¶ 17. On this basis, Plaintiffs demand a nationwide injunction against using "any portion" of *Imagine* for any reason, and "recalling" the Film "for destruction or editing." *See* Order to Show Cause at 3-4; Pl. Memo at 25.

## ARGUMENT

**I.    Plaintiffs Must Meet An Exceedingly High Burden To Obtain A Mandatory Injunction That Silences Expressive Speech On An Important Issue Of Public Concern**

A preliminary injunction is an "extraordinary remedy." *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 277 F.3d 253, 258 (2d Cir. 2002). A party seeking one "must demonstrate (1) irreparable harm in the absence of the injunction[,] and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits . . . and a balance of hardships tipping decidedly in the movant's favor." *See MyWebGrocer, L.L.C. v. Hometown Info, Inc.*, 375 F.3d 190, 192 (2d Cir. 2004).

Plaintiffs acknowledge the injunction they seek here is particularly extraordinary. *See* Pl. Memo at 8-9. The injunction Plaintiffs seek would not maintain the status quo, it would upset it radically by forcing defendants to not only pull *Expelled* out of hundreds of theaters nationwide, but to delete part of the Film. Accordingly, Plaintiffs acknowledge the injunction they seek cannot issue unless Plaintiffs meet a "heightened standard" – one that requires them to make a particularly "clear" and "substantial" showing of likely success on the merits. *See Tom Doherty Assoc., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995); *accord* Pl. Memo at 8-9.

3

But Plaintiffs do not acknowledge the other very extraordinary aspect of the injunction they seek. It would silence expressive speech on a controversial issue of great national importance, and restrict the manner in which the creators of the film are allowed to express themselves. The injunction Plaintiffs request therefore has clear and profound free speech implications. *See, e.g., Vance v. Universal Amusement Co.*, 445 U.S. 308, 315-16 (1980) ("[B]urden of supporting an injunction against a future exhibition [of a motion picture] is even heavier than the burden of justifying the imposition of a criminal sanction for a past communication."); *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) (First Amendment reflects a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open").

This First Amendment concern does not disappear simply because a copyright has been asserted. In the copyright context, First Amendment and free speech interests are protected by the fair use doctrine – a critical "First Amendment safeguard[]" designed to prevent copyright law from unduly burdening free speech. *Eldred v. Ashcroft*, 537 U.S. 186, 220 (2003); *see also Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1263-65 (11th Cir. 2001). In light of the free speech, First Amendment and expressive interests fair use protects, courts must be exceedingly cautious in granting provisional relief over a colorable fair use defense. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578, n.10 (1994) (urging caution against injunctive relief over "reasonable contentions of fair use") (internal citations omitted); *Suntrust*, 268 F.3d at 1265 (reversing preliminary injunction; courts must be cautious in granting injunctions over a "colorable fair-use defense"); Mark A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions in Copyright Cases*, 48 DUKE L. J. 147 (1998) (preliminary injunctions in

4

copyright and trademark cases should be subject to traditional First Amendment analysis as prior restraints on speech).

**II.     Plaintiffs Have Not Established Likelihood Of Success On The Merits Of Their Copyright Infringement Claims**

**A.     There Is A Significant Question Regarding Ownership Of The Copyrights Plaintiffs Assert**

Only the legal or beneficial owner of a copyright has standing to sue for infringement. 17 U.S.C. 501(b); *see Eden Toys, Inc. v. Florelee Undergarment Co, Inc.*, 697 F.2d 27, 32 (2d Cir. 1982). While a prima facie case of ownership is established by presenting a certificate of registration from the United States Copyright Office, the certificates presented to the Court here create a question about copyright ownership that Plaintiffs do not address.

The original copyright registration for *Imagine* identifies Northern Songs Ltd., a United Kingdom corporation, as the sole owner of the copyright. *See* Complaint Ex. B. While Plaintiffs apparently registered renewal rights in the composition in 1998, *see* Complaint at Ex. A, the renewal rights Plaintiffs claim here would vest automatically in Northern Songs Limited – not Plaintiffs – unless Northern Songs received the original copyrights by assignment or license. *See* 17 U.S.C. §§ 304(a)(1)-(2). Plaintiffs present no evidence that Northern Songs received the original rights by assignment or license, as opposed to some other means. Accordingly, Plaintiffs have not established ownership of the renewal rights they assert here.

**B.     Defendants' Use Of *Imagine* Is Protected By Fair Use**

Even if Plaintiffs could show a prima facie case of infringement, Defendants' use of *Imagine* is protected by the fair use doctrine. Fair use is not only essential to protecting free speech interests, it is also critical to achieving the goals of the Copyright Act itself by balancing the need to both protect copyrighted material and "to allow others to build upon it." *Campbell*, 510 U.S. at 575 (fair use is "necessary to fulfill copyright's purpose"); *see also* Pierre N. Leval,

5

*Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1107, 1110 (1990); 17 U.S.C. §§ 106, 107.

In assessing fair use, the Court is guided by four statutory factors. *See Campbell*, 510 U.S. at 577; 17 U.S.C § 107. They are non-exclusive and must be weighed together in light of the underlying purposes of copyright. *See Campbell*, 510 U.S. at 577-78. While they inform the fair use analysis, "the ultimate test of fair use" is whether copyright's "goal of 'promot[ing] the Progress of Science and useful Arts' . . . 'would be better served by allowing the use than by preventing it.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132 (2d Cir. 1998) (quoting U.S. Const. art. I, § 8, cl. 8). Here, none of the fair use factors favor Plaintiffs, and prohibiting the use would frustrate, not serve, the underlying purpose of the Copyright Act.

### 1.    Purpose And Character Of The Use

The "heart of the fair use inquiry" lies in the first factor – "the purpose and character of the use." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006); *see also* 17 U.S.C. § 107(1). The focus of this analysis is the "transformative" nature of the accused work. *See Campbell*, 510 U.S. at 579; *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006). Although this factor also considers whether the use is commercial in nature, commercial use is not a dispositive consideration, and "the more transformative the new work, the less will be the significance of other factors, like commercialism." *Blanch*, 467 F.3d at 254 (quoting *Campbell*, 510 U.S. at 579).

### a.    Transformative Purpose

A work is transformative when it does not "merely supersede[] the objects of the original creation," but rather "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 569. A work is presumed to be transformative where it criticizes or comments on the copyrighted work. *See,*

6

*e.g., NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004) (a strong presumption of transformative purpose arises where defendants use copyrighted work for purpose of criticism or commentary); *see also* 17 U.S.C. § 107 (expressly identifying use of a copyrighted work for "criticism" and "comment" as examples of fair use). Transformative purpose is not, however, limited to commentary or criticism. A work is also transformative where it combines copyrighted expression with original expression to produce a new creative work. *See, e.g., Blanch*, 467 F.3d at 251-52 (finding fair use where painter used portion of fashion photograph as "fodder" for his artistic commentary); *Bill Graham Archives*, 448 F.3d at 608-09 (finding fair use where Grateful Dead concert posters were reproduced in order to illustrate history of the popular musical group); *Hofheinz v. A & E Television Networks, Inc.*, 146 F. Supp. 2d 442, 446-47 (S.D.N.Y. 2001) (finding fair use where television biography used film clips to illustrate career).

Here there can be no doubt that Defendants used *Imagine* for a transformative purpose, because the Film criticizes *Imagine* and the viewpoint it represents. While *Imagine* may have many layers of meaning, its lyrics suggest an overtly anti-religious message. The first three stanzas urge the listener to imagine a secular world without Heaven or hell or any religion, and implies this is a world where all people can live life in peace and that without religion "the world will be as one." *See* Sullivan Dec. ¶ 14 and Ex. A. The Film critiques that viewpoint expressly. It uses ten words from the lyrics of *Imagine* and the music that accompanies them, all lasting fifteen seconds:

> Nothing to kill or die for
> And no religion too

*See* Sullivan Dec. ¶ 17 and Ex. B. As the music plays and these lyrics appear on the screen with the words as they're sung, the film shows a series of four video clips that illustrate what the

producers believe to be the fallacy in the worldview *Imagine* would seem to represent.  As the

Film's producer John Sullivan explains:

> The images provide a layered criticism and commentary of the song building upon each other as the music and lyrics play underneath.  The images demonstrate the social and political process we the filmmakers believe would be required to actualize the ideas promoted by *Imagine*.  The first image is a large circle of children in a school-sponsored activity in a classroom followed by an individual little girl spinning in playful bliss.  This is followed by a clip of a Soviet national parade at the height of the Cold War echoing how these ideas cannot be maintained without realization in a politicized form.  The final stock image clip running over the song is what we the filmmakers believe to be the last step in this process, which is a power grab or a move of "might is right," by a dictator answering to no one.  In this case we selected the image of General Secretary of the Communist Party of the Soviet Union, Joseph Stalin.

*See* Sullivan Dec. ¶ 18.

The Film also critiques *Imagine* implicitly. For several minutes before the *Imagine* clip,

the Film features interviews with academics, intellectuals and entertainers, all of whom suggest

the world would be better off without religion, or at least with less of it. *See* Sullivan Dec. ¶¶ 19,

20 and Ex. C. Following the *Imagine* clip, the Film suggests religion's commitment to

transcendental values place limits on human behavior, and that societies that permit "Darwinism

to trump all other authorities, including religion" pose a greater threat to human values. *See*

Sullivan Dec. ¶ 19 and Ex. C. While one might properly quarrel with the suggestion there is a

link between a secular society and fascism, the Film suggests this connection and therefore

presents a counterpoint to the secular utopia described in *Imagine*. The Film also uses *Imagine*

to trace a chronology. It uses the song to show the secular ideal represented immediately before

the *Imagine* clip is not a new idea, and further suggests it has been tried before with disastrous

results.

In short, the Film not only criticizes *Imagine* and the worldview it represents, it uses Imagine as tool for exploring the consequences of the secular world it envisions. Accordingly, the Film does not use *Imagine* merely to "supersede[] the objects of the original creation" or avoid the drudgery of creating something original. *See Campbell*, 510 U.S. at 569, 579. The Film uses *Imagine* for the purpose of social critique and commentary.    Once this purpose is considered, there can be no doubt the Film "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *See Campbell*, 510 U.S. at 579.

The Second Circuit has found a transformative purpose based on far less than this. In *Blanch v. Koons*, the Court found a transformative purpose where an artist used a fashion photograph as "fodder" for further social commentary.    *See* 467 F.3d at 251-53. In that case, visual artist Jeff Koons copied part of a photograph taken by Andrea Blanch for *Allure* magazine and incorporated it into a painting that was part of his *Easyfun-Ethereal* series. *Id.* at 247. That painting, entitled *Niagara*, "depicts four pairs of women's feet and lower legs dangling prominently over images of confections – a large chocolate fudge brownie topped with ice cream, a tray of donuts, and a tray of apple danish pastries – with a grassy field and Niagara Falls in the background." *Id.* Koons explained that by "juxtaposing women's legs against a backdrop of food and landscape . . . he intended to comment on the ways in which some of our most basic appetites – for food, play, and sex – are mediated by popular images." *Id.* Koons explained that he used Blanch's photograph because "certain physical features of the legs [in the photograph] represented for [him] a particular type of woman frequently presented in advertising" and "[h]e considered this typicality to further his purpose of commenting on the commercial images ... in our consumer culture." *Id.* at 248.

In affirming judgment in favor of Koons on his fair use defense, the Second Circuit concluded that his use of Blanch's photograph was transformative because Koons used Blanch's photograph not simply to repackage it, but "as fodder for his commentary on the social and aesthetic consequences of mass media." *Blanch* 467 F.3d at 253. Koons' use was transformative because he used Blanch's photograph as "raw material" to create a new work with a profoundly different meaning and message by adding new expression to the original photograph. *Id.* The Court acknowledged that Koons could have created *Niagara* without using Blanch's photograph. *See id.* at 255. The Court explained that necessity was not the question; the question was whether Koons had articulated a justification for using Blanch's photograph – that "is whether Koons had a genuine creative rational for borrowing Blanch's image." *Id.* The Court observed that Koons had articulated such a rationale, and justified his borrowing by showing that using Blanch's photographs "advanced his artistic purposes." *Id.*

Here, the transformative purpose is far more compelling. Jeff Koons provided little, if any, direct commentary or criticism of Blanch's photograph; his main purpose in using it was to present a social critique. *Expelled* uses *Imagine* to not only present a social critique, it holds *Imagine* up for explicit and implicit criticism and discussion, and uses *Imagine* precisely because it typifies the viewpoint the Film seeks to criticize.

In *Bill Graham Archives v. Dorling Kindersley Ltd.*, a publisher reproduced seven concert posters as part of an illustrated history of the Grateful Dead. *See* 448 F.3d at 607. The book included many other concert posters, but the Bill Graham Archives refused to license the seven at issue. *See id.* When the publisher used them anyhow, the Bill Graham Archives sued for copyright infringement. *See id.* In affirming summary judgment in the publisher's favor on its fair use defense, the Second Circuit held that no direct commentary or criticism of the posters

10

was necessary to find a transformative purpose. *See id.* at 609. Rather, the court found a transformative purpose based on the fact the book used the admittedly expressive works as "historical artifacts" that enhanced and illustrated the history of the band. *Id.* at 609-10. The Court also premised its finding of transformative purpose on the ground the book combined the seven concert posters with lots of other content, and the posters made up less than 0.20% of the book. *See id.* at 611 ("[W]e are aware of no case where such an insignificant taking was found to be an unfair use of original materials.").

Here, *Imagine* makes up a similarly small portion of the Film – roughly 0.27%. Moreover, the Film uses *Imagine* in a similar context, to contextualize the secular ideal expressed immediately before the clip of *Imagine* by reminding the reader it has long been part of popular culture and imagination. And this is to say nothing of the direct commentary and criticism that creates a "presumption" of transformative purpose. *See NXIVM*, 364 F.3d at 477.

Plaintiffs do not mention *Blanch v. Koons* or *Bill Graham Archives v. Dorling Kindersley Ltd.* Instead, Plaintiffs contend transformation turns on whether using "copyrighted material was necessary to the asserted purpose of criticism [or] comment" and go on to observe that it was not strictly necessary to use the clip of *Imagine* in the Film. *See* Pl. Memo at 17 (original emphasis). But necessity is not the test. It was not necessary for Jeff Koons to use the legs and feet from Andrea Blanch's photograph. He could have simply drawn a pair of women's legs and feet from scratch. It was not necessary for Dorling Kindersley to use the seven concert posters in the book it published about the Grateful Dead. The book contained scores of other concert posters, and it is doubtful anyone would have noticed, much less missed, the seven posters at issue. For that matter, it was not necessary for 2 Live Crew to make a parody of Roy Orbison's *Pretty Woman.*

*See Campbell*, 510 U.S. at 574-75. They still could have made an album full of other songs. Criticism is never strictly necessary. You can always remain silent.

Plaintiffs go on to suggest that this Court's decision in *Byrne v. British Broadcasting Corp.*, 132 F. Supp. 2d 229 (S.D.N.Y. 2001), somehow demonstrates that the Film's use of *Imagine* is not transformative. *See* Pl. Memo at 18-19. But *Byrne* has no application here. In that case, the BBC recorded fifty seconds of a song written by an Irish political activist and used it as part of a twenty-minute television news story concerning the arrest of four Irish nationals in Florida on gun-running charges. *See id.* at 234. The song at issue was used as "theme music" by a radio program that was also recorded as part of the news story. The BBC then used a portion of that song as one of three "clean fades," a technique whereby an audio track is used to "ease the viewer" into a new story segment. *See id.* at 232. The BBC articulated no particular purpose in using the song, other than the fact part of its story was about a radio program that uses the song as theme music. Accordingly, the Court held there was insufficient evidence to find the BBC's use of the song transformative. *See id.* at 234-35. Here, there is abundant evidence of transformative purpose in the form of explicit criticism and social critique.

Plaintiffs next suggest no transformative purpose can be found here because "the use of the Song was plainly to entertain rather than to inform." Pl. Memo at 19. That assertion is contradicted by the content of the Film itself and by the testimony of the filmmakers. It also reflects a misunderstanding of the law. Once an otherwise transformative purpose has been shown, that purpose is not undermined by the fact a clip has inherent entertainment value. *See Wade Williams Dist., Inc. v. Am. Broad Co., Inc.*, No. 00 Civ. 5002 (LMM) 2005 WL 774275 at *9 (S.D.N.Y. Apr. 5, 2005) (rejecting the proposition that "there can be no fair use when copyrighted excerpts are used for entertainment" where Good Morning America segment about

12

portrayal of aliens in science fiction films used the clips at issue to critique the films); *Hofheinz*, 146 F. Supp. 2d at 447 ("It matters not that the Peter Graves' biography was produced to entertain audiences, because the use made of plaintiff's footage in the program was for the purpose of commenting on Graves and what he thought about a picture he appeared in."). Attempting to parse the distinction between expression and entertainment is neither necessary nor appropriate here. *Cf. Stanley v. Georgia*, 394 U.S. 557, 566 (1969) (for First Amendment purposes, "[t]he line between the transmission of ideas and mere entertainment is much too elusive for this Court to draw, if indeed such a line can be drawn at all").

Finally, Plaintiffs suggest the Film's use of *Imagine* was not transformative because there were "equally informative non-infringing alternatives." Pl. Memo at 19. But the issue here is not whether the Film could have been made differently. Nor should it be. *See Blanch*, 467 F.3d at 255 ("It is not, of course, our job to judge the merits of "Niagara," or of Koons' approach to art."). The question is whether the Film used the clip of *Imagine* for a transformative purpose. *See id.* Here, the Film uses *Imagine* for the highly transformative purpose of criticizing the song itself and the views it represents, and as fodder for further commentary on the consequences of the idealized secular world the song advocates.

### b.    Commercial Use

While transformation is the heart of the fair use inquiry, the Court must nonetheless consider the fact *Expelled* is a commercial film. *See* 17 U.S.C. 107(1); *Blanch*, 467 F.3d at 254. This does not disqualify it for fair use protection. On the contrary, *Campbell* recognized most fair uses are undertaken for profit. *See Campbell*, 510 U.S. at 584. Accordingly, the Court should "not give much weight to the fact that the secondary use was for commercial gain." *Castle Rock*, 150 F.3d at 142. Where, as here, the secondary work is highly transformative, its commercial nature should receive even less weight. *See Campbell*, 510 U.S. at 569 ("[t]he more

13

transformative the new work, the less will be the significance of other factors, like commercialism."); *Blanch*, 467 F.3d at 254 ("discount[ing]" the commercial nature of the secondary work in light of its "substantially transformative" nature). Thus, while *Expelled* is a commercial film, that fact is significantly outweighed by its highly transformative purpose. Accordingly, the first factor weighs strongly in favor of defendants here.

### 2.    Nature Of The Copyrighted Work

The second fair use factor focuses on "the nature of the copyrighted work." 17 U.S.C. § 107(2); *Bill Graham*, 448 F.3d at 612. Plaintiffs report that *Imagine* is a creative work and therefore at the "core" of copyright protection. Pl. Memo at 19 (citing *Campbell*). While this may be true, Plaintiffs ignore the fact the Second Circuit has explained that this factor is of "limited usefulness" where a creative work is being used for a transformative purpose. *Bill Graham*, 448 F.3d at 612; *see Blanch*, 467 F.3d at 257.

Plaintiffs likewise ignore the fact the second fair use factor also considers whether a work has been published or not. *See Bill Graham*, 448 F.3d at 612. The composition at issue here has been widely published, and the fifteen seconds of it used in the Film is used for a highly transformative purpose. The second factor therefore receives "limited weight" in this case. *See id.* at 612 (giving second factor "limited weight" where creative work was put to transformative use); *Blanch*, 467 F.3d at 257; *see generally Campbell*, 510 U.S. at 586 (stating that the second factor is not "likely to help much in separating the fair use sheep from the infringing goats" in cases involving transformative copying of "publicly known, expressive works").

### 3.    Amount And Substantiality Of The Portion Used

The third fair use factor requires the Court to assess "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3); *see Blanch*, 467 F.3d at 257. While the Court must consider both the quality and quantity of the portion of

14

the copyrighted work that was used, the central question is whether the extent of copying is reasonable in light of its purpose. *See Campbell*, 510 U.S. at 586; *Blanch*, 467 F.3d at 257 (same; quoting *Campbell*).

Here the Film's purpose in using *Imagine* is to hold it up for scrutiny and criticism insofar as it suggests the world would be better off without religion, and as fodder for further discussion about whether a world without religion is in fact a better place. The portion of *Imagine* the Film uses is narrowly tailored to that expressive purpose. Indeed, the Film uses exactly the ten words from *Imagine* that are pertinent to the film's criticism of *Imagine* and the viewpoint it represents. (P. 8, above.)

Ignoring this, Plaintiffs suggest the third factor favors them simply because fifteen seconds is "more than a 'de minimis' use." Pl. Memo at 20. But the Second Circuit has explained the concept of "de minimis" use is "an inappropriate one to be enlisted in fair use analysis." *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 75-76 (2d Cir. 1997).[1] Plaintiffs also suggest the third factor favors them because the Film uses more of *Imagine* than is necessary. Pl. Memo at 20. Plaintiffs do not suggest how much would be "necessary" here. And necessity is not the test in any event. The test is whether "the quantity and value of the material used . . . are *reasonable* in relation to the purpose of the use." *Campbell*, 510 U.S. at 586 (emphasis added); *Blanch*, 467 F.3d at 257 (same; quoting *Campbell*); *Castle Rock*, 150 F.3d at 144 (quoting *Texaco*, 60 F.3d at 926).[2]

---

[1]    If a use is *de minimis*, it is not actionable. *See Ringgold*, 126 F.3d at 80. Fair use is only implicated once actionable copying is shown, so every fair use inquiry involves a use that is more than *de minimis* by definition. *See id.*

[2]    In discussing the third fair use factor, *Castle Rock* also asks whether "the extent of copying is consistent with or more than *necessary* to further the purpose and character of the use," *Castle Rock*, 150 F.3d at 144 (quoting *Campbell*, 510 U.S. at 586-87) (emphasis added),

15

No matter how the test is articulated, it is applied in light of the purpose of the use. *Campbell*, 510 U.S. at 586; *Blanch*, 467 F.3d at 257; *Bill Graham*, 448 F.3d at 613; *Castle Rock*, 150 F.3d at 144. The Film uses no more of the song than it needs to make its point, and the amount and substantiality of the use cannot be viewed as excessive in light its purpose. *See Campbell*, 510 U.S. at 586. The third factor therefore favors Defendants.

### 4.    Market Effect

The fourth factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor "requires a balancing of the benefit the public will derive if the use is permitted" versus "the personal gain the copyright owner will receive if the use is denied." *Bill Graham*, 448 F.3d at 613 (quoting *MCA, Inc. v. Wilson*, 677 F.2d 180, 183 (2d Cir. 1981)); *Wright v. Warner Books, Inc.*, 953 F.2d 731, 739 (2d Cir. 1991).[3]

#### a.    Substantial Public Interest

The public benefit implicated here is the right to receive information on an issue of public importance. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S.

---

and whether the amount used of the original work was "no more than *necessary*" in light of the purpose of the use. *See id.* (quoting *Campbell*, 510 U.S. at 588-89) (emphasis added). A careful reading of *Campbell*, however, reveals that the decision uses the word "necessary" only to refer to the test the Court of Appeals applied in that case. *See Campbell*, 510 U.S. at 587 ("The Court of Appeals disagreed, stating . . . 'no more was taken than necessary . . . .'") 590 ("as to the lyrics, we think the Court of Appeals correctly suggested that 'no more was taken than necessary'"). *Campbell* reversed the Court of Appeals decision, and held the proper test is whether "the quantity and value of the material used are *reasonable* in relation to the purpose of the use." *Id.* at 586 (emphasis added). In applying that test, the Court emphasized the question is what is "reasonable" versus "excessive," not what is strictly "necessary." *See id.* at 588-89.

[3]    Plaintiffs suggest the fourth factor is "the single most important element of fair use." Pl. Memo at 21 (citing *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S 539, 568 (1984)). Plaintiffs, however, neglect to mention that *Campbell* overruled *Harper & Row* on this very point and held all factors are to be weighed together. *See Leibovitz v. Paramount Picture Corp.*, 137 F.3d 109, 113 (2d Cir. 1998); *American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 926 (2d Cir. 1994). Indeed, *Campbell* explained "the importance of [the fourth] factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors." *Campbell*, 510 U.S. at 590 n.21.

748, 756-57 (1976) (First Amendment protects the right to receive information and ideas as well as provide them). Several states are in the midst of deciding whether to permit the teaching of intelligent design alongside evolution in the classroom. *See* Craft Dec. ¶ 42. This is an issue of great controversy (Craft Dec. ¶¶ 41-42), but that controversy makes the need for uninhibited debate even more paramount. *See Red Lion Broad. v. F.C.C.*, 395 U.S. 367, 390 (1969) ("[s]peech concerning public affairs is more than self-expression; it is the essence of self-government") (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964)); *Sullivan*, 376 U.S. at 270. The free speech interest in uninhibited debate applies to both the opinion expressed, and the manner in which one chooses to express it. *See Cohen v. California*, 403 U.S. 15, 19 (1971) (First Amendment protected the right to express opposition to Vietnam War by wearing jacket bearing the words "fuck the draft").

An injunction here will stop Defendants from expressing themselves in their chosen manner on an issue of great public importance, and will prevent would-be viewers of this film from receiving Defendants' views uncensored. Accordingly, there is a very substantial public interest at stake here.

### b.    No Cognizable Harm

In considering potential market harm, the Court must consider harm to the markets for both the song itself and potential licensing markets, while recognizing that "the more transformative the secondary use, the less likelihood that the secondary work substitutes for the original." *Castle Rock*, 150 F.3d at 145 (citing *Campbell*, 510 U.S. at 591); *see Bill Graham*, 448 F.3d at 614-15. Not all harms to these markets, however, are cognizable. Market harm that arises from criticism, for instance, is not cognizable because copyright owners would not be expected to license criticism of their work. *See Campbell*, 510 U.S. at 592.

17

Here, Plaintiffs complain about lost licensing revenue. Pl. Memo at 21-22. But licensing revenues "lost" from transformative uses are likewise not cognizable because copyright owners have no right to these revenues in the first place. *Bill Graham*, 448 F.3d at 615 ("Copyright owners may not preempt exploitation of transformative markets" by charging licenses for what would otherwise be fair use) (quoting *Castle Rock*, 150 F.3d at 146 n. 11). Indeed, Plaintiffs assert the same market harm the Bill Graham Archives asserted when it claimed that there was "an established market for licensing its images" and that it would suffer "the loss of royalty revenue directly from [the publisher who used the posters] and the opportunity to obtain royalties from others." *Bill Graham*, 448 F.3d at 614; *see* Pl. Memo at 20-22. That argument was rejected there and should be rejected here as well. *See Bill Graham*, 448 F.3d at 614-15 (finding no cognizable market harm where the use of copyrighted material "falls within a transformative market").

Plaintiffs also suggest market harm based on the "widespread belief that [they] had licensed the Song [to] Defendants." Pl. Memo at 21. Yet Plaintiffs do not explain how this belief (even if widely held) presents any cognizable market harm. Nor do they explain why this mistaken belief should have any effect on the scope of Defendants' fair use rights. If the press is asserting, falsely, that Plaintiffs licensed *Imagine*, the proper solution is to simply correct that impression. Plaintiffs likewise complain that their ability to *refrain* from granting licenses is "critical to the preservation of [John] Lennon's legacy." Pl. Memo at 5. But no one has forced Plaintiffs to license anything and "preserv[ing] legacies" is not the point of the Copyright Act. The fact is the Copyright Act permits a variety of *un*licensed uses through fair use and it does not provide an unlimited right to "preserve legacies."

Plaintiffs simply have no right to control the use of *Imagine* for the purpose of criticizing it (*Campbell*, 510 U.S. at 592) or other transformative purposes (*see Bill Graham*, 448 F.3d at 614-15) and the potential licensing revenue "lost" here was not theirs to demand in the first place. *See Bill Graham*, 448 F.3d at 614-15. There is no cognizable market harm to Plaintiffs here, and the fourth factor therefore weighs in favor of Defendants.

In sum, the Film uses *Imagine* for the transformative purposes of criticism and social commentary, uses no more than the 10 words and fifteen seconds of the song pertinent to that purpose, and presents no cognizable market harm. Accordingly, Plaintiffs are unlikely to prevail over Defendants' fair use defense.[4]

### III.    Plaintiffs Cannot Show Irreparable Harm And The Balance Of Hardships Tips Strongly In Favor Of Defendants

#### A.    Plaintiffs Fail To Show Irreparable Harm

Plaintiffs suggest that irreparable harm may be presumed upon a showing of a likelihood of success on the merits of their Copyright Act claims. *See* Pl. Memo at 11. However, Plaintiffs have shown no such likelihood (part II, above) and even if they had, they are entitled to no such presumption.

---

[4]    Plaintiffs do not seek an injunction on their Lanham Act claim. Nor could they. The law is well-settled that sound recordings – even those of legendary artists such as the late John Lennon – do not serve as protectable indicators of source under the Lanham Act. *See, e.g., EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 63 (2d Cir. 2000) (rejecting argument that famous sound recording functioned as a trademark for itself; "Copyright law, not trademark law, is the primary vehicle for protecting the rights of a song's composer or her successor in interest in the musical composition"); *Oliveira v. Frito-Lay, Inc.*, 251 F.3d 56 (2d Cir. 2001). Even if sound recordings could create actionable association, First Amendment considerations would bar the claims. *See Rogers v. Grimaldi*, 875 F.2d 994, 998-99 (2d Cir. 1989) ("in general the [Lanham] Act should be construed to apply to artistic works *only* where the public interest in avoiding consumer confusion outweighs the public interest in free expression"); *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.*, 886 F.2d 490, 495 (2d Cir. 1989).

In *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2007), the United States Supreme Court held presumptions in favor of injunctive relief are improper. *See id.* at 390-393. Instead, courts must apply traditional principles of equity when considering injunctive relief, which requires an actual showing of irreparable injury absent an injunction. *See id.* Following *eBay*, Plaintiffs must show, not presume, irreparable harm. Notably, all of the cases Plaintiffs cite in support of their presumption argument pre-date the *eBay* decision. Plaintiffs also fail to cite this Court's decision in *Canon Inc. v. GCC Int'l, Ltd.*, 450 F. Supp. 2d 243, 251-52 (S.D.N.Y. 2006) (applying traditional rules of equity to a party's request for preliminary injunctive relief in light of *eBay*), *aff'd*, 2008 WL 213883 (2d Cir. Jan. 25, 2008). Lower courts have correctly proceeded to apply *e-Bay*'s rule to copyright cases. *See Christopher Phelps & Assoc., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1212-14 (C.D. Cal. 2007).

Irreparable harm is defined as an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation. *Clonus Assoc. v. Dreamworks, LLC*, 417 F. Supp. 2d 248, 260 (S.D.N.Y. 2005) (citing *Tom Doherty Assocs. v. Saban Entm't, Inc.* 60 F.3d 27, 37 (2d Cir. 1995)). A party requesting preliminary injunction must show that irreparable injury is not merely possible, but that it is likely. *Clonus Assoc.*, 417 F. Supp. 2d at 250 (citing *Jackson Dairy, Inc. v. H.P. Hoods & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)).

In attempting to show irreparable harm, Plaintiffs first complain about "negative press" they received, including accusations from Internet bloggers that Plaintiffs "sold out" the legacy of John Lennon by permitting it to be used in the Film. Pl. Memo at 6, 12; Ono Dec. ¶¶ 11-12. But that negative press was the result of false accusations by Internet bloggers, which were

corrected in any event. *See* Ono Dec. Ex. A (Wall Street Journal story stating filmmakers did not have permission to use the song). Any harm those false accusations created was inflicted by the authors of them, not Defendants, and Plaintiffs fail to explain how the injunction they request would undo that harm in any event.

Second, Plaintiffs complain that their right to refuse licenses is being usurped. Pl. Memo at 12-14; Ono Dec. ¶ 17. But again, no one is forcing Plaintiffs to grant a license; the Copyright Act permits many *un*licensed uses, and Plaintiffs' copyrights in *Imagine* however valuable they are, do not give them right to preclude all uses of *Imagine. See Bill Graham*, 448 F.3d at 614. In any event, all of the cases Plaintiffs cite on this issue deal with piracy and the copying of entire works. *See Dynamic Solutions, Inc. v. Planning & Control, Inc.*, 646 F. Supp. 1329 (S.D.N.Y. 1986) (computer software company unlawfully using the Plaintiffs' entire copyrighted software program); *Cherry River Music Co. v. Simitar Entm't, Inc.*, 38 F. Supp. 2d 310 (S.D.N.Y. 1999) (direct copying of Plaintiff's musical recordings onto CD to be distributed for sale); *Woods v. Universal City Studios*, 920 F. Supp. 62, 65 (S.D.N.Y. 1996) (direct copying of an artist's drawing in a purely commercial movie); *Cheever v. Academy Chicago, Ltd.*, 690 F. Supp. 281 (S.D.N.Y. 1988) (direct copying of all of author's unpublished works prior to unauthorized distribution by defendant). This is a case about fair use of a small portion of *Imagine* in an expressive work. That is a crucial distinction. Unlike piracy cases, there can be no presumption of irreparable harm where the alleged infringer has a bona fide fair use defense. *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265, 1276 (11th Cir. 2001) (citing *Campbell*, 510 US. at 578 n.10; *New York Times v. Tasini*, 533 U.S. 483 (2001)).

Plaintiffs have simply shown no irreparable harm here, much less any that would be sufficient to justify the extraordinary injunction they seek.

**B.     The Balance of Hardships Weigh Heavily in Defendants' Favor**

Even if Plaintiffs could show serious questions on the merits and irreparable harm, the balance of hardships tips strongly in favor of Defendants here.

Plaintiffs suggest the injunction they seek would merely "inconvenience" Defendants and create nothing more than an "economic loss." Pl. Memo at 14. That is plainly false. An injunction against the film would chill the Defendants' constitutional right to free speech, causing even greater and more irreparable harm to them. *See CBS Inc. v. Davis*, 510 U.S. 1315, 1318 (1994) (holding plaintiff's claim that the public airing of a newscast would cause it irreparable injury by publicly disseminating its confidential and proprietary practices and processes must yield to the protections of the First Amendment); *Mason v. Jews for Jesus*, No. 06 Civ. 6433 (RMB), 2006 WL 3230279, at *5 (S.D.N.Y. Nov. 8, 2006) (denying preliminary injunction where plaintiff, a comedian, sued a religious group for using his image in a pamphlet for their organization in a comic manner because the pamphlet was both protected speech and a matter of public interest, and "the proposed restriction of Defendant's constitutionally protected speech causes the balance of hardships to favor Defendant."); *see also LucasFilm Ltd. v. Media Market Group, Ltd.*, 182 F. Supp. 2d 897 (N.D. Cal. 2002) (considering defendant's First Amendment rights in balancing of the harms in a copyright case and denying injunctive relief).

If this injunction issues, the Film will be unavailable for at least four weeks. Craft Dec. ¶ 35. Putting aside the hundreds of thousands of dollars it would cost to recut the film and reprint it (*see* Craft Dec. ¶ 37), the re-release of the Film would occur at the height of the summer movie season – a time during which screen space will be much more difficult, perhaps impossible, to secure, especially as interest in the film diminishes during the intervening weeks. *See* Craft Dec. ¶ 36; Rodgers Dec. ¶ 12A. Even if theaters are still willing to show the Film in the summer season, the Film will have lost the benefit and momentum of its multi-million dollar

22

advertising campaign. *See* Craft Dec. ¶ 36; Rodgers Dec. ¶ 12B. That momentum cannot be regained at any price. *See id.* Accordingly, the number of people who ultimately see this Film will be reduced if this injunction issues. That is not only an economic harm in the form of reduced ticket sales, it is again a free speech harm, this time to the public. (P. 17-18, above.)

This harm will only multiply if the DVD release of the Film is enjoined. Defendants plan to release the Film on DVD in October 2008 for two reasons. *See* Craft Dec. ¶ 33. First, DVD sales are stronger when the DVD release follows closely on the heels of the theatrical run. Second, Defendants want the DVD release to coincide with the fall election cycle due to the political controversy that surrounds this issue. *See* Craft Dec. ¶ 34. In order to make an October 2008 release, the Film must be finalized by end of May of 2008. If Defendants are forced to re-cut the Film (again at great expense), the four weeks it will take to re-cut the Film will almost certainly cause Defendants to miss the October 2008 release date. *See* Craft Dec. ¶ 33.

The commercial interests alone are sufficient to show the balance of hardships tips against an injunction. *See Hofheinz v. AMC Prods., Inc.*, 147 F. Supp. 2d 127, 141 n.13 (E.D.N.Y. 2001) (holding plaintiff widow of former film producer could not obtain a preliminary injunction against televised airing of documentary of her husband's work because Defendant spent over $400,000 producing the finalized documentary, submitted it for award consideration, and therefore such an injunction "would irreparably injure their commercial investment in the Documentary."); *Caterpillar Inc. v. Walt Disney Co.*, 287 F. Supp. 2d 913, 923 (C.D. Ill. 2003) (Defendants would lose benefits of its ongoing marketing campaign promoting film and would have to mount another more expensive campaign to re-release film). Once the First Amendment and free expression rights of Defendants – and the public – are considered, there can be no doubt the balance of hardships tips dramatically in Defendants' favor.

23

## CONCLUSION

Plaintiffs have not met their high burden they must sustain here. Their motion for a preliminary injunction should be denied.

Dated: New York, New York
      May 14, 2008

                                    Respectfully submitted,

                                      Anthony Falzone (admitted *pro hac vice*)
                                      Julie Ahrens (JA-0372)
                                      Center for Internet and Society
                                      STANFORD LAW SCHOOL
                                      559 Nathan Abbott Way
                                      Stanford, CA  94305-8610
                                      (650) 736-9050 Telephone
                                      (650) 723-4426 Facsimile
                                      Email: Anthony.Falzone@stanford.edu
                                      Julie.Ahrens@stanford.edu

                                      Allen C. Wasserman (AW-4771)
                                      Gregory T. Casamento (GC-5273)
                                      LOCKE LORD BISSELL & LIDDELL, LLP
                                      885 Third Avenue, 26th Floor
                                      New York, NY  10022
                                      (212) 947-4700 Telephone
                                      (212) 947-1202  Facsimile
                                      Email: awasserman@lockelord.com

**Of Counsel:**

Roy W. Hardin (admitted *pro hac vice*)
April R. Terry (admitted *pro hac vice*)
LOCKE LORD BISSELL & LIDDELL, LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas  75201
(214) 740-8000 Telephone
(214) 740-8800  Facsimile
Email: rhardin@lockelord.com
aterry@lockelord.com

24