Allen C. Wasserman (AW-4771)
LOCKE LORD BISSELL & LIDDELL, LLP
885 Third Avenue, 26th Floor
New York, NY 10022
(212) 947-4700 Telephone

Of Counsel:
Anthony Falzone
Julie Ahrens (JA-0372)
Center for Internet and Society
STANFORD LAW SCHOOL
559 Nathan Abbott Way
Stanford, CA 94305-8610
(650) 736-9050 Telephone

Roy W. Hardin
April R. Terry
LOCKE LORD BISSELL & LIDDELL, LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
(214) 740-8000 Telephone

Attorneys for Defendants
Premise Media Corporation, L.P.,
C&S Production L.P. d/b/a Rampant Films,
Premise Media Distribution L.P. and
Rocky Mountain Pictures, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

YOKO ONO LENNON, SEAN ONO LENNON, JULIAN LENNON, and EMI BLACKWOOD MUSIC, INC.,

    Plaintiffs,

-against-

PREMISE MEDIA CORPORATION, L.P., C&S PRODUCTION L.P. d/b/a RAMPANT FILMS, PREMISE MEDIA DISTRIBUTION L.P. and ROCKY MOUNTAIN PICTURES, INC.,

    Defendants.
----------------------------------------------------------x

08 CV 3813

Declaration of Ronald C. Rodgers

RONALD C. RODGERS declares:

1. My name is Ronald C. Rodgers. I have personal knowledge of the facts stated below and such facts are true and correct.

## BACKGROUND INFORMATION

2. Since 1969, I have been involved in the distribution and marketing of motion pictures to exhibitors and the marketing of motion pictures to the public throughout the United States.

3. Rocky Mountain Pictures, Inc. ("Rocky Mountain") is engaged in the business of distributing and marketing independently-produced motion pictures to exhibitors and film buyers throughout the United States. It has extensive experience and knowledge concerning the (i) economics of the marketplace for the distribution and promotion of motion pictures, (ii) strategies for the placement of pictures in appropriate venues for the purpose of maximizing viewership and revenue at the time of, and shortly following their initial release, (iii) management of the post-release activities to prolong viewer interest and economic performance, and (iv), when characteristics of the picture permit, re-stimulation of interest in the picture.

4. Rocky Mountain's first contact with Premise Media Distribution L.P. ("Premise Media Distribution") occurred in approximately June 2007. That contact involved the possibility of Rocky Mountain distributing the documentary motion picture, "*EXPELLED*: No Intelligence Allowed" ("*EXPELLED*"). Following discussions and negotiations, Rocky Mountain and Premise Media Distribution entered into a distribution agreement. That agreement provides for Rocky Mountain to provide distribution services and marketing consultation for Premise Media Distribution.

## SELECTION OF RELEASE DATE

5. After extensive discussions between Rocky Mountain and Premise Media Distribution, those firms concluded that the most promising date for the release of *EXPELLED* was Friday, April 18, 2008. That conclusion was based on consideration of numerous factors, including: (i) avoiding the intensely competitive summer and Christmas/New Year seasons for new releases; (ii) the number and nature of other motion pictures scheduled for release during the weekend beginning on April 18; (iii) the number and nature of other motion pictures scheduled for release near the release date for *EXPELLED* and during the weeks following that release date; and (iv) the producers' desire that the picture's influence on the public debate over intelligent design and evolution be brought to bear as soon as reasonable during the election year in 2008.

## ACTUAL PERFORMANCE TO DATE AND PROJECTED PERFORMANCE

6. *EXPELLED* opened on Friday, April 18, 2008 in 1052 theaters located in all 50 states of the United States. To the best of my knowledge, *EXPELLED* opened in more theaters than any other documentary motion picture in the history of the motion picture industry.

7. During the period beginning with the release date and continuing through Sunday, May 11, 2008, *EXPELLED* has been seen by approximately 1,000,000 persons and generated approximately $7,250,000 in box office ticket sales.

8. Based on my experience and judgment, I project that over the weekend beginning Friday, May 16, 2008, *EXPELLED* will be booked in approximately 210 theaters and over the weekend beginning on Friday, May 23, 2008 *EXPELLED* will be booked in approximately 100 theaters. Further, I project that by the end of the day Sunday, May 25, 2008, *EXPELLED* will have been seen by a total of approximately 1,250,000 people and will have generated total

revenue of approximately $8,000,000.00 in box office sales. I also project *EXPELLED* will remain in theaters through the end of the summer of 2008 and continue to generate revenue.

## THE IMPORTANCE OF MARKETING FOR THE THEATRICAL RELEASE

9. The performance over time of almost every motion picture is largely dependent upon the marketing of the picture before and at the time of its release, upon news media assessments immediately following the release, and upon word-of-mouth comments by persons who have recently viewed the picture. Any interruption of the presentation of a picture in theaters will destroy the dynamics which sustain the picture in the market place.

10. These dynamics can seldom, if ever, be recreated following an interruption – new pictures are released; the public's interest focuses on those pictures; old pictures lose their appeal; and the inherent risks involved in any effort to revive a picture mitigate against the expenditure of the millions of dollars any revitalization effort would require.

11. The performance of a motion picture in the theatrical release is an extremely important factor in determining the interest in and success of DVD sales and other film-related products. It is common, indeed expected, that the revenue realized from a film's DVD sales will be a multiple of the revenue from theatrical sales.

## EFFECT OF INJUNCTIVE ORDER

12. If an injunctive order were entered that required the presentation of *EXPELLED* in theaters be interrupted, that order would inflict irreparable damage on Premise Media Distribution and Rocky Mountain, and it would have significant adverse impact on exhibitors and theater customers.

   A. If *EXPELELD* were pulled out of theaters in May to be re-released several weeks later in June or July, theater space would be very difficult, if not impossible, to secure. The summer season is extremely busy in the motion picture industry because the

Declaration of Ronald C. Rodgers – Page 4 of 7

major studios release many big-budget, blockbuster films during that period, many of which appear on many thousands of screens at a time. If, for instance, the film were pulled out of 100 theaters on Friday May 23, no realistic possibility exists that the film would be shown in that many theaters if it were re-released in late June or July. However, a realistic probability exists that no theater space would be available upon any re-release. Further, regardless of when the film might be re-released, if it is pulled from theaters at this time, it will ultimately be viewed by significantly fewer people and the dissemination of its message would be diminished. Thus, in terms of viewership and impact, it will never recover from being pulled.

B.  In addition, because any significant post-release interruption of the exhibition of a motion picture will usually destroy the momentum created in connection with its original release, and because that momentum can seldom if ever be recreated following an interruption, any interruption in the distribution of *EXPELLED* would likely cause Rocky Mountain and Premise Media Distribution to suffer economic damages that could not be recovered through subsequent distribution of the film.

C.  If the distribution of *EXPELLED* were halted or interrupted, news of that occurrence would spread throughout the motion picture industry in the United States and would become the subject matter of widespread discussion. That would have a significant adverse impact on the reputation of Rocky Mountain even though it had no responsibility for, or involvement with the contents of *EXPELLED*. Further such news and discussion would severely impact the reputations of Premise Media Distribution, Premise Media Corporation, L.P., C&S Production L.P., the other Defendants in the lawsuit. (Below, Premise Media Distribution, Premise Media Corporation, L.P., C&S Production L.P. are

referred to, collectively, as the "Premise Entities.") Based on my experience and judgment, Rocky Mountain and the Premise Entities would be irreparably tainted by any interruption in the exhibition of *EXPELLED*, and that taint would not be undone by a subsequent victory in court.

D. Further, damage to the reputation of Rocky Mountain and the Premise Entities would cause independent producers to be reluctant to choose Rocky Mountain as their distributor and exhibitors would hesitate to do business with Rocky Mountain or the Premise Entities. Inevitably, a significant number of producers and exhibitors would choose to do business with Rocky Mountain's competitors and it would suffer economically. The task of proving that such choices and the resulting loss of profitable business were the product of damage to Rocky Mountain's reputation would be very difficult and, perhaps, in most instances, impossible. Thus, any temporary injunction would likely result in Rocky Mountain suffering irreparable damage.

E. As discussed above, based on my experience and judgment, I project that in the absence of any injunction *EXPELLED* will be presented in approximately 100 theaters over the weekend beginning on Friday, May 23, 2008, and that it will be shown in some of those theaters and in other theaters throughout the summer of 2008. Any interruption of the distribution of *EXPELLED* would adversely impact the exhibitors who otherwise would be presenting *EXPELLED*. If an injunction were issued on a Thursday or Friday of a given week, the film would have been shipped to the theaters that had not previously shown the picture, all theaters which intended to show the picture the weekend beginning that Friday would have placed advertising for the weekend and those theaters would have listed the picture in directories consulted by the public. Further, those

theaters may have already posted billboards and marquee announcements for the picture. If presentation of *EXPELLED* were interrupted, the money spent for the advertising would have been spent for no benefit and listings of the picture for the weekend would be wrong. No doubt, persons who undertook to see the picture in reliance on advertising or a listing would be inconvenienced and frustrated. Further, regardless of when during the course of a week a suspension or interruption occurred, theater operators which were showing, or which were intending to show that picture would be required to obtain, if possible, a substitute picture. At best, that would be a difficult hassle. At worst, it could result in a dark screen. Still further, any substitute picture would likely be economically less attractive to the theater operator than *EXPELLED*. Otherwise, the operator would have originally chosen to present the alternative instead of *EXPELLED*.

F.   Any suspension or interruption of the distribution of *EXPELLED* would have far reaching, adverse ramifications for the producers of *EXPELLED*, Rocky Mountain, exhibitors, and moviegoers who would not be able to see the picture, and would surely result in their suffering significant irreparable injuries.

13.   In the course of negotiating the placement of *EXPELLED* in theaters and otherwise distributing the picture, Rocky Mountain did not mention the song *Imagine* or make reference to any lyrics or music from that song being contained in the picture. No reference was ever made to *Imagine* by Rocky Mountain in connection with any of its efforts to promote the distribution of *EXPELLED*.

Further, declarant sayth naught.

Dated: May 14, 2008

*[signature]*
Ronald C. Rodgers