UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
:
YOKO ONO LENNON, SEAN ONO LENNON, JULIAN LENNON, and EMI BLACKWOOD MUSIC, INC.,
:
:            08 CV 3813 (SHS)
:
       Plaintiffs,
:
  -against-
:            DECLARATION OF A. LOGAN CRAFT
:            IN OPPOSITION TO MOTION FOR
PREMISE MEDIA CORPORATION, L.P., C&S PRODUCTION L.P. d/b/a RAMPANT FILMS, PREMISE MEDIA DISTRIBUTION L.P. and ROCKY MOUNTAIN PICTURES, INC.,
:            PRELIMINARY INJUNCTION
:
:
:
       Defendants.
------------------------------------------------------------ x

A. Logan Craft declares and states under penalty of perjury that:

1. I am 47 years old, and I am a resident of Santa Fe, New Mexico. I am a founding partner in Premise Media Corporation, L.P. ("Premise Media Corporation") and I am authorized to make this declaration on its behalf in support of Defendants' memorandum in opposition to Plaintiffs' motion for preliminary injunction. The matters stated herein are true of my own personal knowledge.

2. I am one of the three executive producers of the documentary film *EXPELLED: No Intelligence Allowed* featuring Ben Stein (alternatively, "the film" or "*Expelled*").

Education and Work History

3. I earned a BBA degree from the University of Texas – Austin in 1982; a Master of Divinity from Asbury Theological Seminary in Wilmore, Kentucky in 1988; and an Master of Theology from Regent College, an affiliate of the University of British Columbia, Canada in 2001. I am an ordained priest of The Episcopal Church in the United States of America (ECUSA) and an ordained minister of The Presbyterian Church in America (PCA). Presently, I am a minister, on working sabbatical, at Christ Church Presbyterian, Santa Fe, New Mexico.

4. I have been the founder, producer, and on-air talent of a firm engaged in the production of television programs and a feature length motion picture. In January 2006, two associates and I founded Premise Media Corporation. Since that time, I have served as Chairman of the Board of that firm and its affiliates.

Premise Media

5. Premise Media Corporation is a limited liability partnership registered to do business in the State of Delaware. Its principal U.S. corporate office is located at J.P. Morgan - Chase Tower, 2200 Ross Avenue, Dallas, Texas 75201. The partnership is engaged in the business of providing management services in connection with the concept development,

planning, financing, creation, production, direction, promotion, and distribution of print, video, film and other media products. Those activities have included the production of the documentary film entitled *EXPELLED: No Intelligence Allowed*. My partners and I have served as the Executive Producers of *Expelled*.

6. Our production of the film has been conducted through Premise Media Corporation and certain affiliated business entities. For the purposes of this lawsuit, the pertinent affiliated entities are: (i) C&S Production L.P., a limited liability partnership registered to do business in the State of Delaware and (ii) Premise Media Distribution, LP, a limited liability partnership registered to do business in the State of Delaware and the distributor of *Expelled*. In connection with some of its affairs, C&S Production, LP has used the assumed name "Rampant Films." Below, Premise Media Corporation and these two affiliated entities are referred to as "Premise Media."

Background Concerning *Expelled*

7. *Expelled* is a feature-length (approximately 1 hour, 39 minute) documentary motion picture. It concerns the debate over Intelligent Design and evolution. It is a nationally released theatrical (*i.e.* in major movie theater chains) documentary film that examines the scientific community's academic suppression of those who ask provocative questions about the origin and development of life.

8. The film undertakes to inspire viewers to participate in the scientific, political, cultural, and religious debates surrounding this issue, to urge the scientific community to consider views that differ from those held by many members of that community, and to take action to assure that candidates for public office and elected officials take positions and action to accord free speech rights to critics of the adequacy of Darwinian evolution and to advocates of Intelligent Design.

9.  *Expelled* features as host and narrator Ben Stein, a thinker; actor; comedian; television show host; attorney, valedictorian of his Yale University Law School class, author of 16 books; writer for The Wall Street Journal, The New York Times, The Washington Post and other publications; and former presidential speech writer.

10. Frequently, the film develops its points and conveys its conclusions through parody, satire, and analogy. The film attempts to address these serious matters in an informative, proactive, and compelling manner while at the same time providing the viewer with an entertaining and thought provoking experience.

The Purpose and Role of *Expelled* in the Scientific, Political and Religious Debate

11. We produced and are distributing *Expelled* as a means of offering the public information, concepts, and conclusions concerning evolution related to Intelligent Design and Darwinism and to contribute to the debate and encourage critical thinking on these issues. We want to offer the public compelling evidence that proponents of Intelligent Design are being unfairly criticized, censored, and expelled from public schools, universities, and other forums.

12. Moreover, we want to stimulate interest among, and prompt activity by, individuals and institutions that support Intelligent Design. We want to focus the attention of elected public officials and candidates for public office on the debate, and to spur public officials and candidates to take stands in support of the open debate of Intelligent Design in educational and public forums. In addition, we want to encourage the public to seek legislation at the local, state, and nation levels to assure that all sides of the debate may be heard.

13. *Expelled* has also been produced and distributed for the purpose of earning a financial return for the investors in the production and distribution of the film.

4

The Production and Promotion of *Expelled*

14.  The work on *Expelled* began in British Columbia, Canada in 2005, and in the United States in January of 2006. Since then, many millions of dollars have been invested in the production/formation of *Expelled*, and many more millions in its promotion and theatrical distribution.

15.  Premise Media has retained public relations firms and consultants who have developed and are executing a multi-media marketing plan publicizing *Expelled*, creating interest, and attracting viewers to theaters, and are stimulating debate concerning the film and its message. Further, Premise Media has contracted with a very large number of vendors of services and goods in connection with the promotion of the film.

*Expelled*'s Contribution to Ongoing Political Debates

16.  Premise Media, after consultation with industry experts and careful analysis, strategically chose to release the film in mid-April of 2008. As a provocative documentary, it was important for *Expelled's* message to be delivered during an election year. It is also important that *Expelled's* message is being heard as various state legislatures are considering the Academic Freedom bills. In addition, for these purposes, it is important for *Expelled* to have the opportunity to enjoy as robust an ongoing theatrical release, special theatrical release and DVD release as possible, and to not have that release interrupted, damaged, or delayed.

17.  *Expelled* contributes to the ongoing vigorous debate concerning evolution and Intelligent Design and Darwinism that is occurring across the country.

18.  Apart from its continuing run in theaters, Premise Media has shown and is continuing to show *Expelled* in full-length form to audiences of interested persons and political leaders across the United States. The film has been shown at the State Capital in Tallahassee,

Florida to members of the state legislature, legislative staff personnel, and other interested individuals; in the rotunda of the State Capital of Missouri to the Governor, and members of the Missouri state legislature, legislative staff personnel, and other interested individuals; to state legislators, staff, and other interested persons, in Michigan; at a high level political meeting in New Orleans, Louisiana, which was attended by present and former federal and state legislators as well as the Governor of Louisiana, and one of the major party candidates for U.S. President; and in the Library of Congress to members of the U.S. Congress, congressional staff personnel, and other interested individuals.

19.     The film has been an important part of the discussions regarding Academic Freedom Bills, bills that would ensure the freedom of teachers to help students understand, analyze, critique, and review in an objective manner the scientific strengths and weaknesses of theories of biological and chemical evolution. Alabama, Florida, Louisiana, Michigan and Missouri have all recently introduced Academic Freedom Bills.

20.     Although Premise Media used a very wide assortment of film clips from the documentary to promote the film on the web, on special educational resource DVDs, or on news or entertainment programs, the *Imagine* segment was never used in such video promotions for the film.

<u>U.S. Theatrical Release and Distribution of Expelled</u>

21.     In the film industry, different films must compete for the screens in theaters very much like different products must compete for shelf space in grocery stores. Spring-time is a slower period in the movie business, and thus there is less competition from the large institutional studios for screen space, allowing independent films like *Expelled* to achieve notable success if they can acquire and stay on the screens.

22.     As the movie season moves into summer, when the big studio releases appear in late May and early June, it is critical for *Expelled* to remain in as strong a position as possible, with as large a number of screens as possible, to survive the large studios' summer release schedule. This will allow the film to continue an intended long run in the theaters (longer theatrical runs are more typical of documentaries than other types of films).

23.     *Expelled* was released on Friday, April 18, 2008 for viewing in 1,052 movie theaters across the United States. Over the course of its opening weekend the film generated approximately $3 million in ticket sales. To date, *Expelled* is in its fourth week of its U.S. theatrical release and it has been viewed by over one million people and continues to achieve very high per screen revenue averages and revenue in general, with well over $7 million in total ticket sales generated. It is currently being shown on over 400 screens in over 30 states.

24.     Premise Media has invested several million dollars in the promotion and distribution of *Expelled*. The advertising budget was based on its release on April 18, 2008 with an expected ten to twenty-week exhibition in theaters nationwide.

25.     To accomplish the release and distribution, Premise Media has entered into a contract with a film distribution company, Rocky Mountain Pictures.

26.     In turn, Rocky Mountain Pictures entered into contracts with exhibitors who will show *Expelled*. It takes many months of hard work to place a film with exhibitors and the relationship with the exhibitors *vis a vis* a given film, must be carefully managed. Any disruption to the distribution process or threat of disruption can be highly damaging to a film's theatrical release.

27.     During the next six weeks to three months, the documentary will likely be shown on more than 500 new theaters and/or additional screens in the United States, and viewed by as

many as a half million to one million additional viewers. Screen placement is highly dynamic, rather than static. Films move around, and do not remain on the same screens that they opened on. Once the film has completed its run in a given location, city, or town, it will move to other theaters and screens on which the film has not previously been shown.

28. During its opening weekend, *Expelled* was viewed by approximately a half million movie-goers, representing what should be anywhere from 20% to 35% of percent of the total number of individuals who will see it in a movie theater in the United States during its theatrical release.

29. The first two to four weeks following the opening are extremely critical for any film, and it is essential for the film not to be damaged or harmed during this critical growth phase - immediately following its opening. The film has, in my opinion as a producer and distributor, already been harmed by the present groundless allegations in the lawsuits concerning the use of *Imagine* in the film, and a preliminary injunction would cause significant additional harm and burdens, as is further explained below.

The Importance of the Theatrical Release in Creating Ultimate Viewership and Revenues in Other Distribution Channels

30. A film's performance in its domestic theatrical release is typically the most important driver in the market for the other distribution and revenue channels for a film, especially for a film such as *Expelled*. Other such distribution channels include the Canadian theatrical distribution; domestic and foreign DVD sales and rentals; other foreign theatrical distribution; domestic and foreign television and cable rights (including Pay Per View); and special distribution (schools, churches, boats, planes, etc). The theatrical performance has a lasting economic effect on all other distribution channels and impacts the numbers of viewers in all of the other distribution channels.

31.     The continued success of the film will allow Premise Media to secure DVD and foreign distribution arrangements as soon as possible. In order to generate as high a profile as possible, have our message reach the greatest number of viewers possible, and to maximize profits, the film must remain unhindered and uninterrupted throughout its domestic theatrical release, and throughout the release of the film in the foreign markets and on DVD. Success in properly informing the public, or commercial success of the film outright, cannot be achieved on domestic U.S. theatrical release alone, but depends on these other very important sources of revenue.

32.     Film distribution and revenue channels follow a pattern of immediate, or almost immediate, implementation following or even during an ongoing domestic theatrical release period. *Expelled* has been approached by, and is presently in serious negotiations with, large independent and major studio distributors for the acquisition of both the domestic rights and the foreign rights to these additional revenue producing activities, most especially the foreign film rights and the domestic and foreign DVD rights. These distributors are carefully considering and watching the theatrical release of *Expelled*.

Planned Foreign Film And DVD Distribution Of *Expelled*

33.     Premise Media expects to have its finalized negotiations and contracts in place for its DVD Sales of the current version of *Expelled* by the end of May 2008. Contracts must be in place in by the end of this month in time for the DVD release to be advertised after the end of the theatrical release and in advance of the DVD release for October of 2008. Because DVD releases only occur on a quarterly basis, if these final negotiations and contracts were not entered until June 2008 or later (which is what have to would happen if a preliminary injunction issued), the next available DVD release could not occur, if at all, until January of 2009.

9

34.  Further, it is important to the DVD distributors to roll the DVD release on the heels of an uninterrupted theatrical release and its advertising and publicity campaign. If the DVD release does not occur until January of 2009 or later, Premise Media will have lost the opportunity to send the messages in *Expelled* prior to November 2008 election. This would be a significant loss of audience, in that DVD viewership can be a multiple of viewership in the theatrical release. Moreover, such a late release of the DVD will cause Premise Media to lose the benefit of its advertising and promotional campaign, as well as the momentum generated by the film's theatrical success thus far.

Damaging Effects Of An Injunctive Order

35.  While it is currently estimated that it would take at least four weeks to simply re-cut an inferior and artistically compromised version *Expelled,* the effects in terms of timing and the market considerations would be devastating to Premise Media commercially, artistically and politically. We estimate the costs of re-cutting the film would be several hundred thousand dollars.

36.  It would be commercially impossible to re-release domestically a new version of *Expelled.* The advertising and distribution costs alone would be prohibitive and not commercially viable. Not withstanding its size, Premise Media has spent millions of dollars in advertising and promotion for its national advertising for the domestic release. *Expelled* will lose the benefit of this advertising campaign if the theatrical release or any of the downstream release formats are changed or delayed, as it will not be able to continue to compete for screens with the summer blockbusters. It will take months of lead time to find screen space. By the time that *Expelled* could get screen space, it would have to re-create a significant portion of its multimillion dollar advertising budget. It is simply not economically viable to do so.

37. Of special concern is the upcoming theatrical release scheduled for Canada in early June. Canadian releases either occur simultaneously with a domestic U.S. release or shortly thereafter. In the case of *Expelled*, the Canadian release is scheduled approximately six weeks following the U.S. opening. Additional 35 MM prints are not being produced for the Canadian market as the existing stock of prints from the U.S. theatrical release will be used to service the Canadian market. These existing prints cannot be altered and still meet this release schedule. In addition, altering the prints is not economically viable. While the printing costs are expensive (with each print costing $1,000 a piece and estimating a need of 50 to 100 such prints), the other costs and realities of altering the prints make the option commercially impractical. Further, mastering a new version of the prints to remove or alter any scenes is simply not possible to meet the current Canadian release schedule. Changing the film by deleting *Imagine* will seriously compromise, if not thwart entirely, the Canadian release of *Expelled* and cause Premise Media extraordinary hardships.

38. Changing a film on any format is tedious, expensive, and difficult, once the film has been "locked" for duplication on 35MM prints and on commercial grade DVDs or on High Definition video. From a production standpoint, removing key material and then replacing it, particularly if no suitable replacement exists, without damaging the artistic beauty and narrative sensibility of the film is simply impossible. All that can be "re-manufactured" is a significantly inferior product.

39. Premise Media would suffer several additional harms if there is a preliminary injunction issued related to the *Imagine* clip, either during, or as importantly, following its domestic theatrical release:

40.     **Loss of Significant First Amendment Rights.**  Premise Media will suffer significant damage if we cannot exercise our First Amendment rights.  The ability to criticize songs and lyrics that have provided popular inspiration or powerful messages that a filmmaker does not agree with is essential for the protection of robust and free dialogue in a liberal pluralistic democracy.  Enjoining the use of the *Imagine* clip would therefore harm our First Amendment freedoms and would chill the expression of others who want to convey similar commentary and criticism.

41.     **Loss of Timely Exercising Our First Amendment Rights During An Election Year.**  The release of *Expelled* was purposely slated to coincide with the four year national election year cycle.  It is essential to our participation in the political process that we have the ability to connect with our target audiences with a message that has important cultural and political ramifications, during an election year when our audiences are more sensitive to these issues.  We have a right to try to influence public opinion by exploring the various themes contained in the film, including criticizing the ideals expressed in the song *Imagine.*  It is important that we are as free as possible to influence voters as they form their views about candidates' positions, the appropriate place of religion and government, and the appropriate relationship between religion and science.

42.     **Loss of Timely Exercising Those First Amendment Rights Vis a Vis the Academic Freedom Bills.**  Academic Freedom or Intellectual Freedom bills are making their way through the legislative process in a number of states.  Our ability to inform the public in states that are exploring such bills, and our freedom to express the full range of opinions, or criticism, as protected under the First Amendment, is fundamental. *Expelled* is primarily about freedom of

speech and freedom of inquiry. If the film is enjoined, we will miss the opportunity to influence the debate of these pending bills.

43.   <u>Lost confidence with financial partners and investors</u>. The ability to continue to finance the growth of the film into the additional revenue streams previously described requires the ongoing support of key investors in the *Expelled* project, and their confidence in the integrity of the existing film and the integrity of the producers, is now brought into question by plaintiffs' lawsuits. Enjoining the film related to the use of *Imagine* will further strain these relationships.

44.   <u>Impact on Future projects</u>. Similarly, the ability to finance and promote future projects within a reasonable period of time, will be harmed by enjoining the film. Film projects surrounding controversial cultural and political issues are highly sensitive for most investors and financial partners, and yet these films are essential to a robust public discourse. The ability to attract investors to pending future projects is dependent on their confidence in us as film producers. In addition to *Expelled*, Premise Media will release a novel in June, another book titled "Expelled" is presently being written, and a portfolio of educational DVDs will go to market in the late summer. The reception of the market to these additional products will be potentially damaged and diminished if the film is enjoined because of the 15-second *Imagine* clip. In addition, financial partners, unhappy about the film being enjoined, even preliminarily, may not be willing to fund the proper promotion and expansion required by these additional products.

45.   <u>Diminished revenue and profits.</u>  In short, enjoining the film will significantly adversely affect the sales, revenue, market penetration, and profits to Premise Media, its investors and its distribution partners. Such diminished revenue and reduced profits will occur if the film is enjoined in any way.

46.  <u>Breach of contract with vendors and other third-parties</u>.  Premise Media has existing contractual arrangements, existing bonus agreements, and pending DVD and foreign distribution contracts.  Enjoining the film and requiring the *Imagine* clip to be removed (even if temporarily), will adversely affect these arrangements, agreements, and contracts for the reasons stated previously, *i.e.* revenue will be reduced, the reputation of the film and the film's producers will be diminished, additional advertising will become problematic, as investor relations will become strained.  The time line for the majority of all of the potential revenue for the film (via whatever venue) will occur over the next year.  We cannot re-create that timeline for ourselves or our distribution partners.  We cannot delay moving the film forward.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Los Angeles, California
May 13, 2008

_____
A. Logan Craft